May it please the Court, my name is Brent Newell. I'm appearing on behalf of the Committee For A Better Arvin. I'd like to point out that members of the committee are here with me in court today, seated right there on the right. I'd like to reserve five minutes of my time for a rebuttal. Congress devised this cooperative federalism scheme, the purpose of which was to ensure that there would be federally enforceable plans to achieve these federal health-based standards. And what we have here are unenforceable plans to meet the ozone and PM 2.5 standard. This morning I'd like to hit on two points. First, CARB's commitment to achieve the aggregate tonnage is unenforceable. Second, the inclusion of baseline measures to claim reductions without submitting them to EPA as part of the plan also renders those unenforceable. Now, Judge Kaczynski, you were asking about the standard of review. Oh, it's a matter of interest? Yes. The Act says that those emissions limitations, measures, and controls to attain the standards must be enforceable. So I submit that the Chevron standard of review applies. So the question for the Court is, what does enforceable mean? The Court in Bayview and Warmerdam has looked at what constitutes an enforceable SIP. So in Bayview, only the specific strategies are enforceable, not that goal. This aggregate tonnage commitment is a goal under Bayview. There are no, when you look at CARB's aggregate tonnage, there are no specific strategies, because CARB, all it says is our commitment is to achieve the total emission reductions necessary to attain the federal standards. They're just saying they're going to comply with the Clean Air Act. CARB's, in terms of specific measures, CARB's only committing to propose measures to its board. It's not committing to adopt any specific strategies. All they're doing is saying, we're going to think about them, and we're going to propose them to our board. So very much under Bayview, this isn't an enforceable scheme. This is unenforceable. The saga of the pesticide element is also illustrative here. In Warmerdam, this Court held that a commitment to reduce pesticide, volatile, or organic compound emissions by 20 percent wasn't enforceable when the specific commitment to adopt regulations was not included in the SIP. Again, that's what we have here. After Warmerdam, on remand, EPA went through rulemaking and said, hey, you know what? It's not enforceable, because you haven't committed to adopt regulations by specific dates. And that's, you know, EPA, in their opposition briefs, they make the argument that this case out of Texas, the BCCA Appeal Group, and the New York case, Environmental Defense Fund, those frame up what is an enforceable commitment. But again, what's critically different here is that in those cases, Texas and New York committed to adopt specific regulations. In the case of Texas, they committed to adopt regulations by May 1, 2004, well over three years before the attainment date. In New York, they committed to adopt regulations by October 31, 2001, well over six years before the attainment date. So again, what we have here is nothing but a goal. The court in the previous case asked, what would it look like to file a lawsuit? What does that look like? So assuming that the court holds that this is not a goal, it's an enforceable strategy, this aggregate tonnage thing, what does it look like to enforce it? It's a nightmare to enforce that thing. First, because CARB can move around the baseline, because this aggregate tonnage thing is all based on what the baseline tonnage is. They can change the baseline and thus change what they ultimately need to achieve in the future. And they did that here before EPA took a final action on the rule. Under Warmerdam, citizens can't enforce this baseline manipulation, because the baseline isn't an emission standard or limitation. What we would have to do, like let's say they change the baseline, we'd have to come back in a case like this and sue EPA over whether it was arbitrary or capricious to approve CARB's baseline revision. Much different. And we couldn't challenge effectively the state's change in the baseline in state court, because the state gets almost total deference in how it calculates those baselines. And then again, enforcement would not be practical. EPA has interpreted what enforceable means in the general preamble, and one of the things that goes into something being enforceable is whether it's practical to enforce it. So as a practical matter, figuring out, EPA in the prior case said, well, all they have to do is track the rulemakings. I mean, that's, how many different rulemakings are we talking about here? Because CARB makes an open-ended universe of potential things that could achieve these reductions. Like rulemakings, we'd have to figure out which rules achieved what. CARB also says they're going to use reductions from incentive rules. Well, I mean, they have in fact adopted strategies, right? So it's not like we are, they have in fact adopted measures, right? So we know a little bit about it as a matter of public record. At the time of the final rule, CARB had adopted roughly half of the reductions needed to meet the ozone commitment. And today? There's nothing in the record that says where they are now. It's on the public docket, right? Something could be looked up. It's subject to judicial notice, right? I would challenge the court to figure that out because that's what goes into practical enforceability is whether you can actually discern it. I'm sorry. You don't know? What I'm saying is. No, no. No, no, no. Answer my question. I don't know if they've met. So you don't know what's on the docket? Because they. You don't know what's on the docket? What's in. You don't know what's on the docket? I know what's in the docket of this case. But in terms of all these other rulemakings that could possibly meet this commitment, I don't know. Nor could I reasonably verify what CARB says as being accurate in their rulemakings. CARB is also, Judge Kuczynski, claiming that economic conditions yielding emission reductions would be part of this commitment. Changes in economic activity. How do citizens figure that out? How do citizens figure out whether incentive reductions from public money being used to replace irrigation engines yield reductions? There's this open-ended universe. So really what we have here is. Well, but that's an inherent problem. If they adopt a strategy. I mean, let's say they adopted it up front. You'd have to make an assessment about that. If that's what they had adopted, right? You're saying they didn't adopt specific strategies. That's correct. Okay. You can never tell whether a strategy is going to work ahead of time. You have to take a guess. But that's not the issue. The issue is whether they can adopt a commitment that is open-ended like this without any specific strategies attached to them. I understand. You made that argument. And you say, well, here, for example, they adopted these things, which we can't tell what they are. Eventually they did. And you were saying those are not enforceable because you can't predict. But it's always a matter of prediction, isn't it? You can't know what this open-ended universe of potential things do until the very end, until 2014. So, again, what makes it impractical to enforce is it comes so late in the process. The purpose of having these enforceable strategies is so that there is an achievable air quality standard. If the citizens can't enforce this thing until 2014, right on the doorstep of the attainment deadline, it's not practical to enforce. It's useless, really. Again, that Texas case and the New York case, those commitments that they had to adopt rules, those were several years ahead of the attainment deadline. So it was practical to enforce those. A citizen would go in and say, court, they didn't adopt these six rules that they said they were going to do. You issue an injunction compelling them to adopt those six rules. Here, we would go into court and say, court, order them to achieve 70 tons per day of NOx reductions. Again, big-time disconnect between those two situations. So EPA's interpretation of what's enforceable is not reasonable. I would assert that that would be judged under Step 1 of the Chevron Standard Review, where it is clear what Congress intended. Enforceable means enforceable. And this Court has applied that standard in Warmerdam and in Bayview. Going on to this baseline measure issue. You think enforceable is not ambiguous, not subject to interpretation? Well, I think this Court has interpreted it in Bayview and Warmerdam. EPA has interpreted it in the general preamble, and they came up with that practicality standard. And in addition, EPA interpreted what was enforceable when it applied the Warmerdam ruling in the pesticide element case. So if EPA is carrying on a different interpretation now, then the Court should not defer to a flipped agency interpretation. I can't remember the case that talks about this principle, but where the agency flips its interpretation out of convenience, that doesn't warrant deference. Because what they're saying is enforceable here is very different than what they said is enforceable in the pesticide rulemaking. Very different. If the Court doesn't have any further questions about this enforceable issue, I'd like to talk about the baseline measure issue. Okay. And so with respect to the baseline, both plans rely heavily on reductions from these so-called baseline measures. The PM2.5 plan relies on half of the PM2.5 reductions, 70 percent of the NOx reductions, and 50 percent of the SOx reductions. The ozone plan relies on 80 percent of the NOx and half of the BOC. So most of the reductions that these plans are using to demonstrate attainment come from these baseline measures. The issue we have with the baseline measures is that CARB, again, this is the state agency, the one that submitted that open-ended tonnage commitment, they are refusing to submit their mobile source measures to EPA for inclusion in the SIP. So all these CARB car rules and truck rules and stuff, they are not going to EPA. They are not part of the SIP. Now, under Chevron, the inescapable conclusion is that these rules have to be part of the plan. So under Section 172C6, the measures have to be enforceable and part of the plan. If they are going to be used for reasonable further progress, to the extent they have occurred, they have to come from implementation of measures required under the applicable plan. For contingency measures, they shall be included in the plan. So Congress has spoken directly to this issue and said, if you are going to claim reductions, if you are going to have rules in your plans, they have to go to EPA and they have to be approved. EPA, there are two classes of these baseline measures, waiver and non-waiver. Waiver measures are those vehicle rules that basically talk about engine standards. And Congress has allowed California to enact these rules and they go through a process where EPA waives preemption. Non-waiver measures are more like operational restrictions. Now, we've pointed out some examples in our briefing about non-waiver measures that were not submitted. Here's one, the one called chip reflash. That was a measure that required trucks to install on-board computer software. California Supreme Court invalidated that rule, yet CARB is claiming 38 tons per day of NOx reductions in 2007. This isn't a waiver measure rule and it hasn't been submitted to EPA. It shouldn't be claimed. It's not enforceable. It's not part of the plan. It's not even a rule anymore. There is a measure about truck idling that's both a waiver measure rule and a non-waiver measure rule. To the extent that it's a non-waiver measure rule, it requires truckers to shut down their trucks, not idle them, while they're sleeping overnight. That's a non-waiver rule. That should go to EPA for approval if they're going to claim those reductions. It was not submitted. I'm not clear with your argument going back to a waiver. Are you claiming that a ‑‑ I gathered from your briefs you were claiming that the waiver rules need to be resubmitted as part of the SIP with EPA. Correct. Why do you think that the prior EPA approval of the waiver for preemption purposes is insufficient? Because they don't go through the same process of finding that there's monitoring provisions, that the provisions are sufficiently enforceable, and then they're not incorporated into the Code of Federal Regulations to make them enforceable as part of the SIP. The Warmerdam case held that if they're not listed in the CFRs, it's not enforceable. Go home. So just getting the waiver approval isn't the same thing. EPA could easily do both at the same time. Yes. Without question. Then turning to the non-waiver, what percentage of that in rough terms is out of the reductions that they achieved? It's not set forth in the plan or the record. It's a mystery. All the baseline measures are lumped together, and all the tonnages are aggregated. So we don't know what are waiver and what are non-waiver. I have less than five minutes, but I just want to hit one point. EPA claims that its interpretation allowing exclusion of the waiver measures was ratified by Congress under Section 193. For ratification, Congress has to be aware of this interpretation. Congress was not aware of EPA's interpretation. There's no indication, EPA has pointed to nothing, that would show Congress knew about this waiver interpretation EPA was making. Section 193 doesn't apply in its face, that that's this ratification provision in the Clean Air Act. It doesn't apply because EPA never promulgated anything talking about its waiver interpretation. The first time it ever did that was when my clients challenged EPA's one-hour ozone plan approval, well over 20 years after Congress amended the Clean Air Act in 1990. So there hasn't been any kind of indication that ratification should apply in this case. And I'll save the balance of my time for rebuttal unless there are any further questions. Thank you. Thank you. Okay. Are you? Good morning, Your Honors. Heather Ganji again representing the U.S. EPA. I will be sharing my argument time, three minutes of that, with interveners, and also with my co-counsel, Mr. Dustin Magenfar, who will address waiver measure issues. At the outset, I would just like to briefly address the enforceable commitment issues that were raised before. With respect to the definition of enforceable, it's EPA's position that something is enforceable when a federal or a citizen suit will lie to enforce it, in fact. And so the commitments in this case, we believe, are enforceable because petitioners either can file a citizen suit to obtain appropriate injunctive relief, or EPA can take action under Sections 113 or 179 of the Clean Air Act to enforce those very specific individual commitments. Right. I understand that part of your argument, but I gather your position is consistent with Bayview that you couldn't, a citizen suit would not lie to say you haven't met your goal, and therefore we ask the district court to issue an injunction to that effect, right? I think, if I understand your question... I'm just talking about the aggregate, and I was just saying without respect to any specific measure, you didn't meet your goal, and therefore we want an injunction. And it may help to clarify again the difference between the commitments. It is absolutely EPA's position that if, when EPA is done approving control measures into the SIP, it has not approved enough tons of emission reductions to meet the specific numbers that are encoded in the Code of Federal Regulations, which I notice nobody is quoting when they purport to quote the tonnage commitments. The CFR text includes the very specific numbers. If, when EPA is done with its process, those total numbers have not been met, it is EPA's position that either EPA or the petitioners can go to federal district court to obtain injunctive relief requiring either the Air District or the Air Resources Board, whichever missed its commitment, to achieve that last increment of emissions reductions. How would a court issue an injunction ordering that? Go out and do right? By... I mean, it's one thing to say, look, you've got a commitment for a certain action. You're going to take certain corrective actions. But how does a court issue an injunction saying comply with the law? It's EPA's belief that the court, in fact, could do that. And it is important to point out... Well, how do you square that with the Bayview language, that you cannot sue to enforce an overall objective or aspirational goal? And it's EPA's position that this is not aspirational at all. If you read the Code of Federal Regulations, there are very specific numbers in there. And either they are met or they're not. It's a math problem. Well, that was true in Bayview. There was a 15% reduction in ridership, and they didn't meet it. With respect, Your Honor, if you read the actual text of the commitments, it said that there was an initial understanding that 15% would be a target. No, I understand that, but that's not actually what the court said. What we said is aspirational goals can't be enforced. And, Your Honor, it's EPA's belief that it took a very clear lesson from Bayview and that it should be articulating very clearly exactly what a commitment is. Is the pivot point for your argument the word aspirational? The pivot point for our argument is that the SIP is in the text of the Code of Federal And when you read that text, petitioner's quotations are not complete. The text of the Code of Federal Regulations has very specific numbers for the very specific tons of each pollutant that must be reduced. And it is important to note that in the final rule, in the technical support documents and the proposed rules, EPA pointed out that the control measures listed in the control measure commitment are a strategy for getting there. And it is not correct that all of the reductions from those measures have already been incorporated in reaching the tonnage commitments. A number of those tons have not been counted yet. But EPA said very particularly in all of those documents that it was not just the measures in the control measure commitments that would satisfy those tonnage commitments. It was also emission reductions attributed to other control measures that the state, some of which had already approved and that EPA was aware were already being developed that would achieve additional tons of reduction, all of which the state could ask to have counted towards the tonnage commitments. Right. Could I interrupt just for a second just to make sure I understand your argument? I mean, I understand the math has to add up to the tonnage commitments. And that math is enforceable as to the specifics. But let's assume down the road it just doesn't work out. I mean, there is a gap between the tonnage commitment in the rule and what happens in practice. So to get back to Chief Judge Kaczynski's question, suits brought, how does a court respond to that in any meaningful way? That the district court would order either the Air Resource Support or the Air District within whatever amount of time seemed reasonable based on the evidence presented to the district court to adopt measures that would achieve that delta of emission reductions, knowing that, as EPA described very clearly in all of its documents and the records, that the state, in fact, is doing that. It has been developing and adopting many more control measures than were listed in the control measure commitments. And I do feel strongly to say that those commitment numbers cannot change. And petitioners are simply not correct. The baseline is part of the SIP and is now federal law. The baseline cannot be changed unless the state came back to EPA under Section 7410K with a formal request to amend the SIP. Well, given that both the waiver and some non-waiver baseline components are not included in the SIP, how can they be enforced? And so that I understand you correctly, and maybe my colleague needs to answer this question, are you referring to the numbers in the tonnage commitments? No, I'm talking about this. We start off with a number of measures that were subject to waiver, preemption waiver. And those specific measures are not included in the SIP, correct? That is correct. Your Honor, may I defer to my co-counsel, Mr. Magumfar? Oh, sure. If you're done with your portion. Counsel, Judge Gould, if I could just ask one question on the same line as Judge Thomas's, if you're able to answer. Can a citizen or the EPA, your client, enforce a commitment that was part of the state's greater commitment than federal law required? If the state's waiver provision is not incorporated in the SIP, doesn't that leave EPA out of the business of enforcing it? And, Your Honor, may I defer to my co-counsel, Mr. Magumfar, for waiver measure questions? Thank you very much. May it please the Court, Dustin Magumfar for the United States. Before turning to the question of enforceability of waiver measures, I do want to add one point to my colleague's discussion about enforceable commitments, which is I would refer the Court, certainly it's not binding, but the Citizens for a Better Environment v. Duke Mason case in the Northern District, California, 731 FSUP 1448, I believe provides an example of the type of injunctive relief that the district courts can order. There, there was a commitment to adopt contingency measures, which measures were not specified in the injunctive relief issued by the district court was to, for the district to decide, but to adopt and implement contingency measures to fulfill that requirement. And that's very analogous to the type of injunctive relief that would issue to address a failure to achieve the emission reductions required under the tonnage requirements if the control measures listed in the SIP don't actually get to those emission reductions. Now to waiver. Now to waiver. The answer, if the question is can EPA or citizens directly enforce a California mobile source measure, a waiver measure, the answer is no. The broader context here is EPA is interpreting ambiguous language in Section 7410A2A to determine whether it is necessary or appropriate for waiver measures to be incorporated into the SIP. As to enforceability specifically. So where does that leave the enforceability argument? I mean, a large portion of the SIP consists of these baseline measures, both waiver and non-waiver. And basically you said those aren't enforceable, they're not in the SIP. So why doesn't that violate the Clean Air Act? For non-waiver, Your Honor, I respectfully disagree that there's a heavy reliance on non-waiver measures in the SIP. Well, even whether it's partial reliance. And EPA addressed non-waiver measures in details in its response to comment at excerpts of Record 170 to 175 and explained why it was appropriate in each of those instances, including in the example raised by Petitioner's Counsel, for those measures not to be included in the SIP. So EPA has addressed those. Now to waiver measures, EPA's position in interpreting the structure of the Act, which there is the waiver process and there is the inclusion into the SIP process under 7410. As to enforceability specifically, EPA has found, consistent with congressional intent, to provide California with the most discretion, maximum discretion and flexibility, to push the envelope on addressing the air problems from mobile sources in California. EPA has found that California has as long and as vigorous, possibly more so, an enforcement program than EPA does for federal mobile source measures. And the mobile source, the waiver provision and the SIP provision were both incorporated and created in the Air Quality Act of 1967. So the two have always existed in the history of the Federal Clean Air Act. Except that the SIP relied, in terms, to meet the tonnage reduction requirements in the SIP, you do rely heavily on, I would think I can speak accurately on that, heavily on the so-called waiver provisions. How can a citizen enforce the waiver provisions under the SIP? The baseline measures, which include waiver measures, so that sets out the baseline, including a future baseline. The enforceable, the tonnage commitments are where the state has to get from that future baseline to the next. So the tonnage requirements are distinct from the inclusion of waiver measures in the baseline. So, however, California can fulfill the tonnage requirements through a mix of control measures that are approved under 7410 and waiver measures. In that sense, California is being able to achieve emission reduction. I understand where you're going with the general overall plan, but the question is why shouldn't the waiver measures be included in the SIP? What's wrong with that? Because that's how California is going to meet the tonnage requirements. And absent inclusion in the SIP, then there is no enforcement mechanism by citizens as to those waiver requirements. It is one option, one way that California can fulfill the tonnage requirements is through waiver measures. But what EPA has done, and forgive me for kind of backing up to the big picture, but I think it addresses Your Honor's question, is in construing the two provisions of the Act, 7410, which requires measures to be approved into the SIP and sets for that process, and then the waiver process, which provides a special process for California mobile sources, EPA has always found since the inception of the Act that those measures are not necessary or appropriate for inclusion into the SIP because of there is the in the aggregate language of the waiver measure ensures that the protectiveness of the waiver measures is in the aggregate, at least as protective as federal mobile source measures. While giving California more flexibility, the example of this, of when that language was added in 1977, was that California wanted to focus more on emission reductions of NOx, which are a precursor to ozone, and less on carbon monoxide, and they couldn't get where they wanted to on NOx and also meet the federal standards for carbon monoxide. And that's why Congress adopted the, added the aggregate language to give California that flexibility. So you have a 50-year history of California having this authority given to them by Congress to push the ball forward and push the envelope using its waiver measures. And EPA has never found it appropriate to include those into the SIP because to do so reduces the flexibility that Congress has specifically given California to go with the mobile source measures. So there isn't the... Counsel, if I could ask you a question on that, please. Because I'm getting lost on the argument in the sense that it doesn't make sense to me to say it is not necessary or appropriate to include in a SIP state measures that have been waived in that are necessary to meet the attainment levels. If the SIP is relying on those measures to meet its goals, why don't they have to be enforced by the EPA or by citizens? The waiver... And by citizens, rather, I should say. Right. And it's not really an answer to say CARP has its own enforcement mechanisms. The question of whether mission reductions from a particular measure are necessary to attain is not necessarily the same analysis that EPA undertakes when determining whether it's necessary or appropriate for inclusion into the SIP. And so for waiver measures, waiver measures run in parallel with the federal mobile source measures. Other states are not required to incorporate federal mobile source measures into their SIP, and indeed they do not. But the mission reductions that are achieved from federal mobile source measures are counted in all of those other states' baselines. So the other states that follow federal mobile source measures, they... Well, sure, because that's not under the state control. I mean, I understand that. But this is a different situation. We're talking about making the two portions of the statute make sense when you are relying on the California's mobile source rules, the so-called waiver regulations, to achieve the tonnage requirements. Your answer, I think, is no, those can't be enforced through the SIP. And therefore, the question is ultimately, do you have an enforceable enough commitment under the SIP? And that answer may be no. If we're focused on the tonnage requirements specifically and the use of emission reductions from waiver measures counting towards the tonnage reductions, I would again point to an analogy in the same process that occurs with federal measures, is that the federal measures, if a federal measure is strengthened, the state can count the additional emission reductions that are achieved from that newly strengthened federal measure. The same is analogous for when California strengthens a waiver measure or adds a new one and achieves more. The enforceability specifically for the tonnage requirements, it is the bottom-line answer that I can give, Your Honor, is that EPA, in interpreting the two sections of the Act, has found that California's enforceability is sufficient and that it's not necessary or appropriate to include those measures into the SIP for the purpose of enforcement because of the history of California's enforcement and because of the ---- Can they be enforced in state court? My understanding, Your Honor, is no. So there's no enforcement available to private citizens for these California measures. True? That is true. These are the enforcement ---- enforcing the waiver measures, as with federal mobile source measures, which are enforceable, is enormously complex and challenging, and both California and EPA have vigorous enforcement programs for them. Right. But we were talking generically on whether you're acting arbitrarily, capriciously in making this rule, and part of that is do you have enforceable commitments. Your generic answer both in this case and the last case is, look, we have all these specific enforceable requirements, but with respect to the baseline issues, with respect to those that have been waived by EPA, no. And that's a huge chunk, really, of how you're going to attain those goals, at least it appears to me. I do think it's important to understand there is a ---- I'm not saying it's not wise or not a good strategy. We're talking about what you're legally required to do. I understand. And there is a ---- I want to be clear that there is a distinction between the waiver measures that are part of the baseline, the emission reductions from those measures in the baseline, are not being used to fulfill the tonnage reductions. Those measures are already part of the state's projection, so the state is figuring out how do we go down. So it's ---- there's no evidence in the record that California is relying heavily on waiver measures for fulfilling the tonnage reduction commitments, because that's before moving forward, at least in the context of ozone, where the attainment deadline is still 10 years out. So I just want to clarify that there is a distinction between the so-called reliance in the baseline for future baseline inventories versus how California is going to actually fulfill ---- You have a minute and a half left. Do you want to save it for counsel? Yes. I'd like to give the remainder of the time to Dana. Thank you. Good morning. May it please the Court. Annette Ballatore-Williamson, District Counsel for the San Joaquin Valley Air Pollution Control District. At the beginning of this argument, Petitioner's Counsel framed the question as what is the meaning of enforceable. I would like to put a little bit of a twist on that, and I submit that the question really is enforceable by whom. What Petitioner's overarching premise is in this case is that they, as citizens, may not necessarily have the enforcement options that they would like to have. But whether citizens can or can't enforce certain aspects of a SIP, in my mind, is really irrelevant to whether the control strategy itself is approvable under the Clean Air Act. This Court's focus ---- Approvable and enforceable are two different concepts. Well, this case is about whether EPA's final rule, which approved the control strategies, was proper. Petitioner's premise is that it was improper, it was unapprovable, because these certain aspects, the regulatory commitments combined with the tonnage commitments, were unenforceable, and that made the control strategy itself unapprovable. That's the way I see Petitioner's argument. And they rely on, you know, the Bayview case and the Warmer Dam case and others for examples of situations where a commitment wasn't, or maybe not a commitment, an aspirational goal or something along those lines was unenforceable by citizens. But I think that the Clean Air Act and the Section 304 citizen suit provision really only gives citizens a limited, you know, limited enforcement options under the Clean Air Act, when there's a violation of an emission standard or a limitation, or when EPA fails to perform a nondiscretionary act. And it's only under those two limited circumstances that citizens have an enforcement right. In contrast, EPA has other enforcement tools that they can take. And, in fact, the Bayview court held that with respect to, of course, the Bayview court held that the target itself was unenforceable by citizens, but what the Bayview court also said is that the four-step strategy designed to achieve that target goal was enforceable and that the remedy, the relevant solution to an emission shortfall, is a SIP revision to adopt new measures. So there was a remedy there, it just may not have been the remedy that citizens would have wanted. I think that the petitioners here spend a lot of time complaining about whether they have effective remedies. For example, if ARB decides to adjust the baseline inventories, or if they can effectively track the emissions reductions that ARB or the district will take credit for to satisfy the tongued commitments, I've heard petitioners, counsel say that it's a nightmare to enforce or they can't challenge effectively. But I think the bottom line is that the petitioners really complain about potential opportunities for participating in the public processes as being slow or cumbersome or not to their liking. That's really a question for Congress or the state legislature. But I think that counsel for EPA has done a very good job of explaining why both the tonnage commitments themselves and the regulatory measures designed to achieve those tonnage commitments are enforceable. Thank you. You have some time left for rebuttal. Thank you, Your Honor. EPA talked about how specific tons are listed in the Code of Federal Regulations, and that somehow made this aggregate tonnage commitment enforceable. Notwithstanding the other problems with trying to enforce that, those specific tons come from EPA, not the state. EPA, in its interpretation of what the state has submitted, came up with those numbers and put them in the Code of Federal Regulations. What's key here is in the Warmerdam case, the Ninth Circuit said that what is enforceable is what the state submits, not what EPA interprets the state to have submitted in the preamble. So what the state has submitted in the state strategy and in the two status reports that came in was this vague commitment to achieve whatever is necessary to meet the standard in the future. The state didn't commit to those specific numbers. It listed some tonnages in tables as examples of what they thought the shortfall was. But ultimately, their commitment was to get whatever it took to comply with the Clean Air Act. So EPA extrapolated from that, crunched the numbers during the rulemaking, and stuck it in the Code of Federal Regulations. I submit that that is not what the SIP is. Citizens in EPA can enforce what the state submits. So just because those numbers show up in the Code of Federal Regulations doesn't mean that that's what the documents say the state is committed to do in the SIP. Counsel, could you briefly, could you at least briefly please address the argument made in response on the waiver issues that to include them in the SIP would somehow impair flexibility of the SIP? Well, Judge Gould, Congress didn't want state flexibility in the scheme of cooperative federalism. It wanted state, an ironclad contract between the state and the federal government to achieve these standards. So EPA's interpretation of the word necessary, and whether EPA gets to decide what's necessary, first let's step back and take a look at that language. Congress, when it included necessary, it was talking about what states decided to include in their plans, not what EPA decided was appropriate to include in the SIP. See, because states decide what the strategies are going to be. They come up with the plans and they give it to EPA. EPA has an extremely limited role under the Clean Air Act to only approve or disapprove what the state submits. EPA has no authority under Section 110K to willy-nilly pick and choose what is necessary to have in the state implementation plan. Their job is to make a finding of whether it complies with the Clean Air Act or not. And if it doesn't, then disapprove it. So in terms of this word necessary, that's not talking about EPA and whether EPA has authority to exclude waiver measures if it deems it appropriate. It's talking about what choices the state makes to claim reductions. And in this case, the state has claimed massive reductions from these baseline measures. Council for EPA said there's no evidence in the record that the baseline measures are accounting for a large amount of reductions. That's just not true. In the PM2.5 case record at Petitioner's Excerpts of Record, page 160, over half of the PM2.5 and 70 percent of the NOx reductions come from these baseline measures. In the ozone record at Petitioner's Excerpts of Record, page 118 through 128, and page 321, 80 percent of the NOx reductions are coming from these baseline measures. Half of the VOC reductions are coming from the baseline measures. So there's this overwhelming amount of tonnage that's being used in the attainment demonstration from these baseline measures, and EPA says it's not necessary to include in the SIP. If it's not in the SIP, it's not enforceable by EPA or citizens. Plus, it's subject to backsliding. Thank you. Thank you.
judges: Kozinski, Thomas, Gould